[No. 1878.]

### Bob. Coombes *v.* The State.

1. Practice — Proof of Character.— The defendant having assailed the credibility of a State's witness by showing that such witness was under indictment for illegal branding, and that he, the defendant, was a witness against him, and that his feelings towards the defendant were unfriendly,

the State had the right to prove that the general reputation of the witness for truth and veracity was good.

2. SAME — INTENT — CHARGE OF THE COURT. — In a trial for theft the court charged the jury as follows: "If the defendant killed the cow without the consent of the owner thereof, with the intent to deprive the owner of the value thereof, and appropriate it to the use and benefit of the defendant, then this would constitute theft of said cow." In view of the evidence in this case, and in view of the fact that another portion of the charge fully instructs the jury that, to constitute theft, the taking of the property must have been with a fraudulent intent, the paragraph quoted is not materially erroneous because it omits to instruct the jury that the killing of the cow was with a "fraudulent intent" on the part of the defendant, — the charge being, as all charges must be, construed as a whole.

3. THEFT — CASES APPROVED AND OVERRULED. — ASPORTATION is not, under the statutes of this State, necessary to constitute the offense of theft. Under the doctrine laid down in *Hall's* case, 41 Texas, 287, and *Madison's* case, 16 Texas Ct. App., 435, it is *held* that, the circumstances showing an intent to steal, the killing of the cow of another on the range, though the animal had never actually passed into the manual possession of the slayer, is sufficient to show such a taking as will support a conviction for theft of the animal. In so far as it announces a contrary rule, the case of *Martin* v. *The State*, 44 Texas, 172, is overruled.

4. EVIDENCE — OWNERSHIP. — An unrecorded brand is competent evidence of the identity of an animal on which it is found, when such identity becomes a question involved in a legal proceeding, but it is not even presumptive evidence of the ownership of the animal. See the opinion, and the statement of the case, for evidence *held* insufficient to support a conviction for the theft of a cow, inasmuch as it fails to establish the ownership of the animal as alleged in the indictment.

5. SAME — CONSENT. — Conceding it to be true that the cow involved in this case was the separate property of the wife of the party alleged to be the owner, such alleged owner had the sole management of the animal during the marriage, and *prima facie* the wife could not legally consent to the taking of the same without being joined in such consent by her husband, the alleged owner; and hence, though the consent of the wife might, perhaps, be available as a defense, the State could not be required to prove the want of the wife's consent.

APPEAL from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge

The conviction in this case was for the theft of a cow, the property of G. W. Parsons, in Dallas county, Texas, on the 22d day of January, 1883. A term of two years in the penitentiary was the punishment assessed against the appellant.

G. W. Parsons was the first witness for the State. He testified that he lived about fourteen miles west of Dallas, in Dallas county, near Grand Prairie. Witness and his wife owned cattle branded JVJ on the left shoulder, side and hip, and his wife owned cattle in another brand. Neither the defendant nor other person

had the witness's consent to take any of the said cattle. Witness did not see the alleged stolen animal after she was killed, nor did he know that he had ever seen her. Witness was in the city of Dallas on the day whereon the cow was killed. Witness saw the hide of a cow that had a bullet hole in it, and which bore the JVJ brand. The defendant and the witness married sisters.

On cross-examination the witness testified that he did not know how many the stock in the JVJ owned by himself and his wife would number. He had never collected and seen them all, and he could not say that he had ever seen the cow killed by the defendant. Some of the cattle in said brand he bought with his own and some with his wife's money, but in what proportion or numbers he could not tell. Witness had been married to his wife about two years. He knew the cow alleged to have been killed by the defendant to be his by the brand on the hide. He had no other means of knowing. Witness is not under indictment for horse theft, but is under indictment for branding horses not his own, of which offense he was innocent. The defendant is a witness against the witness in that case, and it was the opinion that he, defendant, procured that indictment. Witness at no time told Mrs. Eliza Fletcher that had not the defendant procured his indictment for branding the horses, he, witness, would not have procured this indictment against defendant. Witness and defendant were on bad terms prior to the killing of the cow, and are on such terms yet.

Re-examined, the witness stated that he purchased the JVJ cattle from Mrs. Vernoy, and thought they numbered perhaps some four or five hundred. He bought also from seventy-five to one hundred and fifty head of horses and some land, for all of which he paid some five or six thousand dollars. The defendant was a thief.

J. K. P. Jordan testified, for the State, that for the last twenty-five years he has lived near Grand Prairie, in Dallas county, Texas. The defendant lived on Fish Creek, about four miles from the witness. Witness was on Fish Creek, near the defendant's house, on the 22d day of January, 1883, hunting cattle. While witness and Charley Ayres were standing on the south side of Fish Creek, they heard a gun fired to the north of where they stood. Separating from Ayres, the witness crossed the creek and rode in the direction whence the report of the gun came. After proceeding some distance, a quarter of a mile perhaps, he saw the defendant sitting on his horse with a gun across his lap. Witness's horse stumbling attracted the attention of the defendant, and the defendant thereupon rode off in a trot, which he soon increased to a gallop. Fifteen

feet from where the defendant was standing when witness first saw him, the witness found a prostrate JVJ cow, shot behind the left shoulder, but not yet dead. Witness then repaired to a rendezvous appointed with Ayres, and again returned to the cow and found her dead. *En route* to Fish Creek, witness passed the defendant's house, a short distance north of it. He then saw the wagon and horses of one Hannaford, a peddler of beef, who lived at Grand Prairie, standing behind the defendant's house. Witness did not see Hannaford himself. Hannaford's horses, with wagon attached, were hitched back of defendant's house, opposite from the public road.

Cross-examined, the witness testified that the dead cow lay in Fish Creek bottom, about one hundred and fifty yards outside of defendant's field, but in the defendant's pasture, if land inclosed by a mere brush fence, completely down in many places, can be called a pasture. Witness did not know how long he was in going from the point where he heard the report of the gun to the point where he found the cow, but thought fifteen or twenty minutes would cover the time; though, as he looked through a bunch of cattle on his way, it may have taken him thirty minutes. The defendant lived about a half mile from where the cow was killed. Witness knew that the witness G. W. Parsons's reputation for honesty and integrity in the community in which he lived was good.

Charley Ayres testified, for the State, that he was on Fish Creek near defendant's house in Dallas county on January 22, 1883, in company with J. K. P. Jordan. He heard a gun fire some little distance down the creek, and he and Jordan separated, going towards the point from which the report came, on different sides of the creek. Reaching a point some little distance below, he saw the defendant sitting on his horse, with a gun on his lap, on the opposite side of the creek. Defendant started off, riding in a rapid trot until he reached the open woods, when he increased his speed. Witness rode back to where he was when he heard the shot, and saw the defendant gallop up to his house. Presently a man got in a wagon at the defendant's house and started off. Before he got far another man got in the wagon, and the two rode off together. Witness judged from appearances at that distance that the defendant talked briefly with the man at the wagon before the wagon was driven off. Witness then went to the place where he first saw the defendant, and within fifteen feet found the dead body of a JVJ cow. G. W. Parsons's general reputation for truth and veracity was good.

Dick Parsons was the next witness for the State. He testified

that in January, 1883, he lived with his brother, G. W. Parsons, about three-fourths of a mile distant from the defendant's house. During that month, Charley Ayres notified witness that a JVJ cow had been killed. Witness and Jack Vernoy went with Ayres to the body of the cow, where they found the witness Jordan. Witness and Jack Vernoy skinned the dead animal, and took the hide to G. W. Parsons's house, leaving the carcass where they found it. The body of the cow lay about a quarter of a mile from defendant's house, and about two hundred and fifty yards distant from the defendant's cultivated land. The State rested.

E. A. Hannaford was the first witness for the defense. He testified that he lived near the town of Grand Prairie in Dallas county, Texas. On the 22d day of January, 1883, he went to Grand Prairie to get his wagon repaired. On his way he met the blacksmith, who told him that the piece of wood he had selected for the purpose was not suitable to repair the wagon with. The witness then started to the house of W. P. Preston, of whom, on the preceding Saturday, he had engaged a beef. The purpose of this visit was, that, being too cold to peddle the beef at the time, he wished to get Preston to defer the slaughter of the beef until the ensuing Saturday. Passing the defendant's house, which lay *en route*, he was informed by the defendant that Preston was not at home, but would pass the defendant's house on his return that evening. Witness concluded to wait at defendant's house for Preston, and did wait several hours, leaving finally without seeing him. He requested defendant to tell Preston not to kill the beef until the next Saturday.

On his cross-examination the witness testified that he did not take his butcher's tools with him on the day mentioned, and his trip was not undertaken for the purpose of getting beef. He could not have transported beef on his wagon in its then broken condition. His first purpose in stopping at the house of the defendant was to see defendant about the purchase of an ungathered crop of cotton on a place that he and defendant were talking of buying. He ate dinner at the defendant's house on that day, and looked about the defendant's place for a piece of timber suitable to repair his wagon, and found none. He had no engagement or agreement to purchase a beef from the defendant or other person on that day, and could not have transported one in his broken wagon. Defendant left the house during the witness's visit, but he had no gun or pistol that the witness saw. Witness, without unhitching his horses, fed them on the south side of defendant's house. The defendant did not ride up to the witness's wagon just before the witness left the defend-

ant's house on that day. He did not see either Charley Ayres or J. K. P. Jordan on that day, nor did he hear the report of a gun or pistol.

Mrs. Eliza Fletcher testified, for the defense, that the State's witness G. W. Parsons married a niece of the witness. Since the presentation of the indictment in this case, the said Parsons has told the witness that he would not have procured the indictment of the defendant for the theft of the cow had not the defendant procured his, Parsons's, indictment for illegal branding of certain horse stock. Witness knew the cattle in the JVJ brand well. Those cattle were breachy in the extreme, and for several years had been a source of great annoyance to the whole neighborhood.

Mrs. Mary Coombes, evidently the wife of the defendant, testified in his behalf that she distinctly remembered the Monday Hannaford was at defendant's house and took dinner. While Hannaford was at the house, the defendant came in, having been to Grand Prairie, and remarked: "That d——d cow has broken in on me often enough, and I am going to kill her." The witness remonstrated with the defendant and advised him to pen her up, but her remonstrances had no effect. Defendant took his pistol and left the house. Shortly after the defendant left, the witness heard the report of a gun or pistol. The defendant returned to the house after a short time. Hannaford was still there and remained there, in the house, for some time afterwards. Witness did not remember all matters discussed by Hannaford and the defendant, though the purchase of a cotton crop was spoken of. While there Hannaford said that he was waiting to see Mr. Preston. Defendant sold several hides to Hannaford.

The defense then, by agreement, read the evidence of Ben Wilson, as follows:

"The defendant wrote a note to G. W. Parsons, the alleged owner of the cow which the defendant is charged with stealing, informing the said Parsons, that he, Parsons, must come and take the said cow away, as he, defendant, could not build a fence sufficient to turn her, and that if he, Parsons, did not take the cow away, he, defendant, would kill her. The said note was written before the killing of the cow is alleged to have occurred, and given to witness, Ben Wilson, to deliver to said Parsons."

John Wooley testified, for the defense, that in January, 1883, he was hunting in the Fish Creek bottom. While passing east through the defendant's pasture on that occasion, he heard the report of a gun or pistol. Looking in the direction from whence the

sound proceeded, he saw a cow jump out of the defendant's field and run in the direction of Fish Creek. He then saw the defendant sitting on his horse outside of his field, about fifty yards from where the cow started. The cow passed close enough to the witness for him to see that she was a JVJ cow, and that she was wounded. Defendant then rode towards a point on Fish Creek farther from the witness than the one to which the cow went.

On his cross-examination, the witness was asked why it was that he was always on hand to testify in behalf of thieves. He replied that such was not the case; that on this occasion he was duck and squirrel hunting. If the defendant had a gun on that occasion, witness did not see it. Witness would have seen his gun, he thinks, if defendant had had one.

The State, in rebuttal, introduced six witnesses, all of whom testified that the reputation of G. W. Parsons for honesty and integrity was good. Several of the six, and other witnesses, testified that the reputations of the defense witnesses Hungerford, Ben Wilson and Wooley, for truth and veracity, was bad.

G. W. Parsons, recalled by the State in rebuttal, testified that he never received from the defendant a note complaining of a breachy cow, through the hands of Ben Wilson or any other person. The JVJ brand of stock contained a good many breachy cattle a year or two prior to this trial, but the witness had sold most of them.

The questions discussed in the opinion were raised on the motion for new trial.

*Coombes & Gano* filed an able brief for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. I. It was not error to permit the State to prove the general good reputation for truth and veracity of its witness G. W. Parsons. The credibility of this witness had been attacked and put in issue by the defendant, by showing that he was then under indictment for illegally branding horses, and that the defendant was a witness against him in that prosecution, and that his feelings toward the defendant were unfriendly. This, we think, authorized the State to prove that his general reputation for truth and veracity and integrity was good. (*Dixon* v. *The State*, 15 Texas Ct. App., 271.)

II. It was not error, under the facts of this case, for the court to charge the jury that "if the defendant killed the cow without the consent of the owner thereof, with the intent to deprive the owner

of the value thereof, and appropriate it to the use and benefit of the defendant, then this would constitute theft of said cow." In another portion of the charge the jury were fully instructed that, to constitute theft, the taking of the property must have been with a *fraudulent* intent; so that, construing the charge as a whole, the above paragraph is not materially erroneous because it omits to tell the jury that the killing of the cow was with a "fraudulent intent" on the part of the defendant. But counsel for defendant object to this charge upon another ground, and that is that the mere act of *killing* the cow did not constitute *a taking*, but that there must have been an *actual taking* of the cow, and that, under the evidence in this case, the cow, though *killed* by the defendant, was not *taken.* The proof was, by two witnesses for the State, that they heard a gun fire, and went in the direction of the sound, and in fifteen or twenty minutes after they heard the report of the gun they came in view of the defendant in the woods, who was sitting upon his horse with a gun before him, and when he saw them he rode away in a rapid gait. They went to where he was standing when they first saw him, and fifteen feet from that place they discovered the cow lying upon the ground, not quite dead. The cow had been shot behind the shoulder.

Does this evidence show a *taking* of the cow within the meaning of our statute defining the offense of theft? Upon this question there is a conflict between two decisions rendered by our supreme court. In *Hall* v. *The State*, 41 Texas, 287, the court says: "We think that, under our statute, where the circumstances show the intent to steal, the offense of theft may be complete with the killing. A case may be imagined where the animal is killed with the intent requisite to constitute theft, and yet it might not come into the possession or under the control of the thief, but might at the time be and remain in the possession of the owner. It is not necessary to hold the theft complete in such cases in order to support the charge in this case. The charge must be taken with reference to the facts of the case. The hogs were killed in the woods, out of the immediate custody of the owner. By the act of killing, under such circumstances, the defendant may fairly be held to have had the hogs under his control and in his possession. Manual possession, actual handling, does not appear to be essential in case of animals, even in common law larceny." (Citing 2 Bish. Cr. Law, § 813, and note 7.)

The case of *Martin* v. *The State*, 44 Texas, 172, seems to us to be in direct conflict with the case from which we have just quoted, and if the doctrine announced in this latter case be correct, then there

can be no question but that the charge of the court, that the *killing* of the animal was a *taking* of it, is erroneous. The two decisions being irreconcilable, and both of them being directly in point with reference to the question in this case, we must determine which of them, in our opinion, announces the correct doctrine. Considering the fact that to constitute theft under our statute, asportation of the property is not necessary, we are clearly of the opinion that the decision in Hall's case, *supra*, is correct, and that the decision in Martin's case, *supra*, is wrong, and we shall therefore adhere to the former and overrule the latter.

We adopted this same view of this question in a case decided at the last Austin term. That was for the theft of hogs, and the proof showed that the defendant never had manual possession of the animals,— that they were running in their usual range and were gentle; that he called them up around him, and pointed them out to another person as his hogs, and sold said person the hogs, and said person thereafter took actual possession of them. Presiding Judge White, who delivered the opinion of the court (which opinion we have not before us, it not having yet been published), discussed the question as to what constituted a *taking* of property, at length reviewing the cases and authorities bearing thereon, and the court held that in that case there was a *taking* of the hogs within the meaning of our statute. (*Madison* v. *The State*, 16 Texas Ct. App., 435.)

III. After a careful examination of the statement of facts, the only evidence we find which proves or tends to prove that the cow killed was the property of G. W. Parsons, as alleged in the indictment, is that she was in his cattle range, and was branded in his brand. This brand was unrecorded. Parsons did not see or know the cow, but saw the hide, and from his brand upon the hide concluded, and so testified, that she was his cow. It was shown that he had a large number of cattle in this brand, and that he had sold a number of them before this cow was killed. It is well settled that an unrecorded brand is not evidence of ownership,— is not even presumptive evidence of ownership. It may be used in evidence to aid in establishing the identity of an animal, but not to prove the ownership of the animal. (*Maddox* v. *The State*, 12 Texas Ct. App., 429; *Fisher* v. *The State*, 4 Texas Ct. App., 181; *Hutto* v. *The State*, 7 Texas Ct. App., 44.)

In this case the unrecorded brand was used to prove ownership, and not to identify the cow. Upon it the State mainly relied to establish the ownership of the cow as alleged in the indictment. Without it, there was no proof of such ownership. We must,

therefore, hold that the State failed to prove the allegation of ownership, and that the conviction is not supported by the evidence.

IV. Although the cow may have been the separate property of Parsons's wife, he had the sole management of the same during the marriage (Rev. Stats., art. 2851), and *prima facie* the wife could not legally consent to the taking of the cow without being joined in such consent by her husband. We therefore think it was not required that the State should prove the want of consent of the wife to the taking. Such consent might be a defense, but the want of it is not necessarily required to be shown by the prosecution.

Because the ownership of the cow was not proven, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered December 6, 1884.]